# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 2, 2010

## STATE OF TENNESSEE v. ANTON MAYHEW AND TRAVIS BROWN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-00039     W. Mark Ward, Judge**

---

**No. W2009-02184-CCA-R3-CD - Filed July 8, 2011**

---

Defendant Anton Mayhew was convicted of two counts of aggravated robbery, a Class B felony, and was sentenced as a Range I, standard offender to a pair of concurrent twelve-year terms. Defendant Travis Brown was convicted of two counts of aggravated robbery, a Class B felony, and one count of aggravated rape, a Class A felony. He was sentenced as a Range I, standard offender to concurrent twelve-year terms for the aggravated robberies and to a concurrent twenty-five-year term as a violent offender for the aggravated rape, for a total effective sentence of twenty-five years. On appeal, Defendant Mayhew claims that the trial court erred in admitting a portion of one witness's testimony and that the evidence is insufficient to support his convictions. Defendant Brown claims that the evidence is insufficient to support his convictions and that the trial court erred by denying his request for a jury instruction relating to missing evidence, by requiring him to stand next to an enlarged photograph in open court, and by sentencing him to the maximum sentence. After careful review of the record and the arguments raised by both defendants and the State, we affirm the judgments of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Anton Mayhew.

Patricia A. Woods, Memphis, Tennessee, for the appellant, Travis Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

According to trial testimony given by the two victims and law enforcement officials in this case, Victim One (a male international student) was returning home from work during the early morning hours of August 22, 2002, to an apartment he shared with Victim Two (a female international student). After Victim One parked his car behind his building and began walking to the apartment, he was approached by the defendants, and one of the men held a gun to his head and told him to hand over all his money. After he did so, the defendants forced Victim One to lead them to his apartment, where they discovered Victim Two lying asleep in her bed. Defendant Mayhew hit Victim One in the eye with his gun and forced him into the bathroom while he ransacked the apartment. While Victim One watched from the bathroom, Defendant Brown forced Victim Two to perform an oral sex act on him. At the conclusion, Victim Two spit some of Defendant Brown's semen onto the bed and was forced to wipe his remaining semen off with her hand. The defendants then forced Victim Two into the bedroom closet and left, taking approximately six hundred dollars from the victims.

Victim One left the bathroom, assisted Victim Two, and telephoned 9-1-1. A police investigation was begun, and Victim Two was transported to the Memphis Sexual Assault research center, where a nurse took a DNA swab from her hand and noted that the victim had sustained an injury to her lip. Meanwhile, the police processed the crime scene. During this process, Victim Two's bed linens may have been collected and stored in the police property room. The following day, both victims provided a description of the perpetrators.

Soon thereafter, Victim Two was shown several photo lineups and erroneously identified an individual named James McMoore as one of her attackers. Mr. McMoore was arrested and charged with the attack, but these charges were later dismissed after neither victim identified him as a perpetrator at his preliminary hearing. The case went cold.

Approximately four years later, then-Detective Charles Shettlesworth, an officer in the Memphis Police Department who had been assigned the cold case, was informed by the Tennessee Bureau of Investigation ("TBI") that its testing database had matched the DNA sample taken from Victim Two's hand with Defendant Brown. Some weeks later, investigators obtained a saliva sample from Defendant Brown that confirmed the DNA database match. The DNA match also led police to a second suspect, Defendant Mayhew, because these two individuals had been caught and convicted for committing a pair of aggravated robberies and an aggravated assault together a few days after the robberies in question and the rape of Victim Two. This suggested to police that the crimes committed on August 22, 2002, may have been the first stages of a larger crime spree committed by the defendants.

Both victims were shown additional photo lineups containing the defendants. Victim Two identified both defendants from these lineups as her attackers on the night in question. Victim One also identified Defendant Mayhew as one of the attackers with 90% certainty.

On January 9, 2007, the Shelby County Grand Jury issued an indictment charging the defendants with two counts of aggravated robbery and one count of aggravated burglary. In addition, the jury charged Defendant Brown with one count of aggravated rape. The trial court later dismissed the aggravated burglary charges against both defendants on statute of limitations grounds. Both defendants were tried before a jury from August 17-20, 2009.

Prior to trial, Defendant Mayhew filed a motion *in limine* to prevent any witnesses from referencing the house robberies and other crimes he committed with Defendant Brown. The State sought to introduce evidence of the defendants' joint arrests in order to buttress the identification of the eyewitnesses. After a pretrial hearing, the trial court granted the defense's motion to exclude any evidence of the defendants' arrests and convictions. However, the trial court did permit Detective Shettlesworth to testify that, before preparing the photo lineups containing Defendant Mayhew's image that were later shown to the victims, Shettlesworth "was able to establish with conclusive evidence" that the two defendants were in contact with each other during the time period surrounding the crime.

Defendant Brown also filed a pretrial motion seeking to suppress the State's DNA evidence after it was discovered that Victim Two's bed linens (presumably containing a stain from the semen that Victim Two testified she spit out after performing the sex act), which may have been taken into evidence years before, could not be located. The State opposed the motion, eventually explaining in testimony given by Detective Shettlesworth that: (1) the DNA sample that had been matched to Defendant Brown had been taken not from the bed linens but from the victims' hand, (2) once a DNA match was found, it was the policy of the TBI not to perform DNA testing on any other evidence; and (3) there was no reason to believe that any semen that may have been contained on the victim's bed linens had ever been tested. The trial court ultimately denied the motion to suppress and refused Defendant Brown's further request to give the jury an instruction pertaining to missing exculpatory evidence. The trial court reasoned that there was no reason to believe that the bed linens had been intentionally destroyed. Moreover, the trial court concluded that there was no reason to believe that any DNA that might have existed on the linens would prove to be exculpatory – even assuming that additional DNA was discovered on the bed linens and this additional DNA did not match Defendant Brown, it would not call into question the validity or accuracy of the existing DNA match that had been made from the DNA swab taken from Victim Two's hand.

At trial, the State presented the testimony of both victims as described above, and both

victims identified the defendants as their attackers. Prior to being identified by Victim Two and over his objection, the State had Defendant Brown stand next to an enlarged photo of Mr. James McMoore, presumably to show the physical similarities between the two men for purposes of helping to explain Victim Two's earlier misidentification of Mr. McMoore as her rapist. In addition to the testimony of the victims and Detective Shettlesworth, the State also presented during its case-in-chief the testimony of Officer Chavis Davis of the Memphis Police Department, who testified that he responded to and secured the initial crime scene, interviewed the witnesses, and made an initial crime report; Detective David Royal, who testified that he examined the crime scene and found it to match the victims' reports of what had transpired; Nurse Margaret Aiken, who testified that she treated Victim Two after the rape, administered a rape kit, and took DNA swabs of her hand and mouth; Officer Shan Tracy, who testified that he photographed the crime scene and processed and recovered the evidence; Officer Hyun Kim, who collected the DNA evidence from Nurse Aiken, sent it to TBI for analysis, and secured it after testing was complete; Officer James Hill, who testified that he examined a latent fingerprint from the crime scene but was unable to match it to either defendant; Ms. Franchesca Sanders of the TBI, who testified that she received the DNA evidence sent by the Memphis Police Department and secured it in TBI's vault; and Dr. Qadriyyah Debnam of the TBI's Memphis Crime lab, who testified that he compared the DNA swab taken from Victim Two's hand and found that it did not match a sample taken from Mr. James McMoore but did match a saliva swab from Defendant Brown to a degree of probability that exceeded the world's population.

The defendants presented a single witness in their defense, Dr. Jeffrey Neuschatz, an associate psychology professor at the University of Alabama in Huntsville. Dr. Neuschatz testified that he had conducted numerous studies in the area of eyewitness identification and had discovered numerous problems associated with it, such as source confusion, difficulties in cross-racial identification, errors that may occur when eyewitnesses are given multiple identification chances, and the fact that stress may adversely affect eyewitness memory. After his testimony, the defendants were advised of and waived their right to testify in their own defense, pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). The case was then submitted to the jury.

During deliberations on Thursday, August 20, 2009, the jury sent the trial judge a question asking, "How did Detective Shettlesworth come to find Anton Mayhew and Travis Brown were in touch with each other around the time of the crime?" The judge refused to answer, stating, "I cannot answer that," and directed the jury to continue its deliberations. The jury returned soon thereafter and rendered a verdict of guilty on all counts. The trial court approved the verdicts that same day.

At the sentencing hearing on September 10, 2009, neither defendant made a statement

in mitigation. The trial court sentenced both defendants on their two aggravated robbery convictions by starting at the bottom of the sentencing range for the Class B felonies. The trial court then found an enhancement factor based on the defendants' lengthy criminal histories (including five or six felonies each) and sentenced each defendant to the maximum term of twelve years. With respect to Mr. Brown's rape conviction, the trial court started at the midpoint of the range for the Class A felony, again found the defendant's criminal history to be an enhancing factor, and imposed the maximum sentence of twenty-five years. However, in light of defendants' age (nineteen years) at the time they committed the offenses, the trial court permitted all sentences to run concurrently, leaving Defendant Mayhew with an effective sentence of twelve years and Defendant Brown with an effective sentence of twenty-five years.

The defendants filed timely motions for a new trial, which were denied on October 9, 2009. These appeals followed.

I.

Both defendants challenge, in somewhat cursory fashion, the sufficiency of the evidence to support their convictions. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Great weight is given to the result reached by the jury in a criminal trial; matters such as the credibility of witnesses, the weight given their testimony, and the proper resolution of any conflicts in the evidence are ordinarily left in their care. *Dorantes*, 331 S.W.3d at 379. Consequently, "on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Id.* (internal quotation omitted). In essence, a jury's verdict of guilt strips the defendant of the presumption of innocence and replaces it with a presumption of guilt that the defendant must strive to overcome on appeal. *Id.*

In this case, the essential elements at issue are those of the crimes of aggravated robbery and aggravated rape. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2011). A robbery is aggravated if it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon," or if "the victim suffers serious bodily injury." T.C.A. § 39-13-402. "Aggravated Rape" is defined in pertinent part under Tennessee law as the "unlawful sexual penetration of the victim by the defendant accompanied by . . . force or coercion and the

-5-

defendant is armed with a weapon." T.C.A. § 39-13-502 (a)(1). "Sexual penetration" is defined to include "fellatio." T.C.A. § 39-13-501(7).

With these standards and definitions in mind, we turn to the defendants' arguments that the evidence is insufficient to sustain their convictions on all charges. In this regard, Defendant Mayhew observes that there was no physical evidence, such as DNA evidence or fingerprints, linking him to the crime scene. Defendant Mayhew also points out difficulties with the prosecution's eyewitness identifications, including the amount of time that passed between the crime and the identifications, Victim Two's earlier misidentification of James McMoore as one perpetrator, and the fact that Victim One was only 90% confident in his initial photo identification of Defendant Mayhew as one of the perpetrators. Defendant Brown argues that due to the inherent difficulties with eyewitness testimony, the State's loss of the Victim Two's bed linens, and because of certain technical complaints regarding the type of DNA testing that was done in his case, the trial court should have set aside the defendants' convictions in its capacity as the "thirteenth juror."

The defendants' complaints regarding eyewitness testimony, DNA testing, and lost bed linens all go to the weight of the evidence and the credibility of the State's case and its witnesses. Weighing the evidence and evaluating the credibility of witnesses are quintessential jury issues and ones which we will not disturb on appeal. *See Dorantes*, 331 S.W.3d at 379. For purposes of resolving the defendants' sufficiency of the evidence claims, it suffices that the defendants were identified at trial as the perpetrators by two eyewitnesses. Defendant Brown's identification was additionally supported by DNA evidence sufficient to exclude the remainder of the population of the planet. This evidence is amply sufficient for a reasonable jury to conclude that the defendants were, in fact the perpetrators of the crimes at issue.

II.

Defendant Mayhew argues that the trial court erred in allowing Detective Shettlesworth to testify about the defendants' association with one another around the time of the crime, claiming that this testimony amounted to impermissible evidence of prior bad acts under Tennessee Rule of Evidence 404(b) and was unduly prejudicial under Tennessee Rule of Evidence 403. We disagree.

The admission of evidence at trial is entrusted to the broad discretion of the trial court and, as such, a trial court's ruling on the admission of evidence may only be disturbed upon a showing of an abuse of that discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). A trial court's exercise of discretion will not be reversed unless the court "applied an incorrect legal standard, or

reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (*quoting State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

The general rule is that all relevant evidence is admissible unless a particular constitutional provision, statute, or rule excludes it. Tenn. R. Evid. 402. For example, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading to the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Evidence of a defendant's prior bad acts may also be inadmissible under Rule 404(b), which states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may, however, be admissible for other purposes, and, when the prosecution seeks to introduce such evidence, a trial court should, *inter alia*, "hold a hearing outside the jury's presence" and "determine that a material issue exists other than conduct conforming with a character trait" before admitting the evidence. *Id.*

In the case at bar, when the prosecution sought to introduce evidence of the defendants' prior convictions, the trial court followed proper Rule 404 procedure. At a pair of pretrial hearings, the court heard lengthy arguments from both sides. The prosecution urged that admission of the defendants' prior arrests was necessary not to show that they were habitual robbers who acted in conformity with that character trait on the night in question, but to show that the two individuals knew and associated with each other around the time of the crimes for purposes of bolstering the credibility of the initial photo identification of Defendant Mayhew as Defendant Brown's accomplice. After hearing the arguments and making many of the findings necessary to admit such evidence under Rule 404(b), the trial court eventually ruled against the prosecution and barred any discussion of the defendants' prior arrests and convictions out of concerns over possible prejudice to the defendants.

In essence, therefore, the defense prevailed on this issue. However, because the existence of a prior relationship between the defendants was "highly relevant" to the issue of identity, the trial court *did* permit Detective Shettlesworth to testify that he had determined by "conclusive evidence" that Defendant Mayhew and Defendant Brown were in close association with each other during the time period surrounding the offenses. We do not believe that the trial court abused its discretion by permitting this testimony, which we believe prudently balanced the prosecution's interest in bolstering the eyewitness identifications with the defendants' right not to be convicted based on character evidence. The testimony that was admitted made no reference to the fact that either defendant had ever committed prior crimes. While we recognize that it might be possible under different

circumstances for a State's witness (like Detective Shettlesworth) to convey that a particular defendant has been previously arrested (or has committed some other similar bad act) to a jury without using those precise words, we do not confront such a case today. The testimony given by this particular witness was not tantamount to a backdoor attempt to circumvent the strictures of Rule 404(b); the mere fact that two individuals are known to be in close association with one another – even when attested to by a police officer – does not necessarily imply that they have been convicted (or even suspected) of prior crimes.

Our broad conclusion is supported in this instance by the conduct of the jury, which during its deliberations sent the judge a note asking "[h]ow did Detective Shettlesworth come to find Anton Mayhew and Travis Brown were in touch with each other around the time of the crime?" Posing this question would not have been necessary if the jury had somehow gleaned that through use of the word "association," the witness somehow meant to convey "arrested together for prior robberies." The trial court properly declined to answer the jury's question. We can find nothing in our review of the trial court's efforts in this area that suggests even the slightest error, much less an abuse of discretion.

III.

Defendant Brown claims that the trial court erred by denying his request for a lost evidence instruction concerning certain bed linens that may have been taken from the victims' apartment during the initial police investigation, but which could not be located years later in preparation for trial. We can discern no merit in this claim.

"A defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. Special jury instructions may be given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001). A trial court's "refusal to grant a special request for an instruction is error only when the general charge fails to fully and fairly provide the applicable law, considering the instructions in their entirety and reading them as a whole rather than in isolation." *Dorantes*, 331 S.W. at 390 (*citing State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009)).

With respect to missing exculpatory evidence, the due process clause of the Tennessee Constitution provides even greater protection to defendants than that afforded by the U.S. Constitution. *State v. Ferguson*, 2 S.W.3d 912, 914 (Tenn. 1999). In Tennessee, when the State loses or destroys allegedly exculpatory evidence, trial courts should use a two-step process to discern an answer to the overarching question of "[w]hether a trial, conducted

without the [missing] evidence, would be fundamentally fair?" *Id.* First, the trial court must ascertain "whether the State had a duty to preserve the evidence." *Id.* at 917. The State has such a duty if the evidence "might be expected to play a significant role in the suspect's defense" because it "possess[es] an [apparent] exculpatory value" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* If the missing evidence meets this standard of constitutional materiality and the State has failed in its duty to preserve it, then the trial court must determine the consequences of the breach, bearing in mind the degree of negligence involved, the significance of the destroyed evidence in light available substitute evidence, and the sufficiency of other evidence used at trial to support the conviction. *Id.* Depending on the particular circumstances, a judge may dismiss the case, take no action, provide a "missing evidence" instruction, or "craft such [other] orders as may be appropriate to protect the defendant's fair trial rights." *Id.*

After reviewing the record, we believe that the jury instructions given by the trial court correctly and fairly informed the jury regarding the applicable law and that the trial court's decision declining to give the jury a special "missing evidence" instruction was not in error. We are not entirely convinced that the State was under any duty to preserve this evidence, as the exculpatory nature of the victim's bed linens in this case was questionable at the very least. The State's witnesses testified that a DNA swab was performed on the victim's hand following the rape and that an expert matched this swab to Defendant Brown's DNA with a high degree of certainty. Even if the victim's bed linens had also contained a testable semen stain and even if further DNA testing revealed that this semen came from a different donor, it would not exonerate the defendant because it would not call into question the validity of the DNA test performed using the sample from the victim's hand. Consequently, it is far from clear that the bed linens "possess[ed] an exculpatory value that was apparent before the evidence was [lost]," as required by *Ferguson,* in order to trigger the State's duty to preserve evidence.

However, even assuming that the bed linens might have had some potential exculpatory value that would have been evident to police during the early stages of the investigation, meaning that the State had a duty to preserve them, the loss of this evidence did not render the defendant's trial fundamentally unfair. There was no evidence that the State intentionally destroyed or misplaced the bed linens or did so as a result of gross negligence. Several years passed between the commission of this crime and the development of the Defendant Brown as a suspect. Therefore, the State's degree of culpability with respect to the loss of the bed linens is slight. Determining whether comparable substitute exculpatory evidence was readily available is difficult to assess in this case because the manner in which the missing evidence might have proven to be exculpatory has been so ill-defined. However, it is clear in analyzing the third *Ferguson* factor that the remaining

evidence used at trial to support the defendant's conviction was more than sufficient. Defendant Brown was identified as the perpetrator by the testimony of two eyewitnesses and by DNA testing sufficient to exclude the remaining population of the planet. Under the totality of the circumstances, we have little difficulty concluding that Defendant Brown "received a fundamentally fair trial and that he experienced no measurable disadvantage because of the unavailability of the [missing] evidence." *Ferguson*, 2 S.W.3d at 918.

IV.

We find no merit to Defendant Brown's additional claim that the trial court erred by requiring him to stand next to an enlarged photograph of a prior suspect during his trial. Whether or not to permit demonstrative evidence of this sort generally rests within the sound discretion of the trial judge. *E.g.*, *Hughes v. State*, 148 S.W. 543, 551 (Tenn. 1912) ("[Demonstrative] evidence is, of course, largely in the discretion of the trial judge, who may in a proper case refuse to permit his court room to be littered with cumbrous structures that should be represented by maps, diagrams, or photographs."); *State v. Underwood*, 669 S.W.2d 700, 704 (Tenn. Crim App. 1994) ("[W]e see no reason why [demonstrative] evidence is not admissible within the discretion and control of the trial judge.). "Like all evidence, the demonstration must be relevant evidence, and its probative value must not be substantially outweighed by the danger of unfair prejudice." *Lovin v. State*, No. E2009-00939-CCA-RM-PC, 2010 Tenn. Crim. App. LEXIS 935, at *29 (Tenn. Crim. App. at Knoxville, Nov. 10, 2010).

Prior to being identified by Victim Two at trial, the trial court required Defendant Brown to stand next to an enlarged photograph of Mr. James McMoore, the individual who had been erroneously identified by Victim Two as one of the perpetrators years earlier. The defense objected to the demonstration on grounds that it was not relevant and constituted "unnecessary theatrics." The trial court overruled the objection, and Defendant Brown now complains that the demonstration was unduly prejudicial.

However, we can find no fault with the trial court's decision. The demonstration was relevant because the degree to which Defendant Brown bore a resemblance to the earlier suspect could have a bearing on whether or not a jury might consider her earlier mistaken identification to have been reasonable. If Defendant Brown bore no resemblance to Mr. James McMoore, then her mistake would be less reasonable (and the credibility of her later identification of Defendant Brown would be more suspect), whereas if the two bore a strong resemblance, then a jury might have more confidence in her ability to remember and successfully identify her attackers in subsequent photo lineups and in court. Defendant Brown's relevance objection at trial was based on his assertion that it served no purpose to compare the appearance of Defendant Brown in the year 2009 to a picture of Mr. James

-10-

McMoore in the year 2002. However, concerns stemming from the fact that Defendant Brown's appearance may have changed in the intervening years go to the weight that should be given to the demonstrative evidence, not its relevance (and, by extension, its admissibility).

Defendant Brown argues on appeal that the State could have accomplished the same goal of bolstering Victim Two's identification of the defendant by furnishing photos of both the defendant and Mr. James McMoore to the jury after Victim Two identified Defendant Brown as her attacker. However, the Tennessee Rules of Evidence do not require the State to present demonstrative evidence in the manner preferred by the defendant. We can discern no meaningful prejudicial impact on Defendant Brown's case from his merely being ordered to stand next to an enlarged photograph of a prior suspect. As relevant evidence that did not cause undue prejudice to the defense, the trial court was well within its discretion to compel the demonstration.

V.

Finally, Defendant Brown complains that the trial court erred by sentencing him to the maximum prison term permissible for his range on each count (twenty-five years for the aggravated rape and twelve years for each aggravated robbery), which reflected an increase over the sentences requested by the State. Specifically, Defendant Brown claims the trial court erred by refusing to find his youth at the time of the offense to be a mitigating factor, thereby justifying sentences less than the maximum. However, after reviewing the record, we conclude that the trial court's decision to impose maximum sentences on Defendant Brown is fully consistent with the purposes and principles of the Sentencing Act. "The burden of demonstrating that a sentence is erroneous is [placed] upon the party appealing," *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008), and that burden has not been met in this case.

Our review of a trial court's sentencing decision is *de novo*, but we will presume that the trial court's determinations are correct if the record reflects that the trial court considered the proper sentencing principles and all the relevant facts and circumstances. *Id.* at 344-45. After a review of the record, we conclude that the trial court followed the sentencing act and appropriately applied all of the sentencing factors. A "trial court is free to select any sentence within [a defendant's] applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343 (citing T. C.A. § 40-35-210(d) (2006) (emphasis added)).

In light of the facts of the crimes at issue, as well Defendant Brown's extensive criminal history (which the trial court found as an enhancing factor, and relied upon in its

decision to impose maximum sentences), we can discern no fault with the trial court's decision to decline to view the offenses at issue as youthful indiscretions and to deny the request to consider the defendant's age to be a mitigating factor at his sentencing. At the time of his sentencing, Defendant Brown had seven prior felony convictions and six prior misdemeanor convictions. Although many of these offenses were committed subsequent to the offenses committed in this case, trial courts may consider any criminal behavior (and any resulting convictions) occurring prior to sentencing as "previous history of criminal convictions or criminal behavior," and use this behavior to enhance a defendant's sentence under the auspices of Tennessee Code Annotated section 40-35-114(1) (2011). *See State v. Jordan*, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003).

Consequently, the trial court was free to conclude that Defendant Brown's acts of criminal misbehavior, including several crimes involving the use of a weapon, were not those of a child lacking the ability to appreciate the consequences of his actions. The trial court would also have been free to conclude that this criminal history fully justified the imposition of maximum sentences, regardless of the presence of one or more mitigating factors. Furthermore, we agree with the trial court's observation that, based on his extensive criminal history, Defendant Brown might well have qualified for consecutive sentencing on all counts, had the trial court not chosen instead to reduce his total effective sentence for the criminal acts at issue by bestowing the boon of concurrent sentencing.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE